# PHELPS DUNBAR LLP
## — COUNSELORS AT LAW —

New Orleans, LA

Baton Rouge, LA

Houston, TX

London, England

W. BOWEN MCRAE, JR.
Admitted in Louisiana
and Mississippi
(225) 376-0211
w.racb@phelps.com

City Plaza • 445 North Boulevard • Suite 701
Baton Rouge, Louisiana 70802-5707
P. O. Box 4412
Baton Rouge, Louisiana 70821-4412
(225) 346-0285
Fax (225) 381-9197

www.phelpsdunbar.com

Jackson, MS

Tupelo, MS

Gulfport, MS

Tampa, FL

16067-4

July 20, 2006

## VIA FACSIMILE & U.S. MAIL

Pamela J. Edwards
Equal Employment Opportunity Commission
Houston District Office – 460
1919 Smith St., 7th Floor
Houston, TX 77002

    Re:      John W. McMorris
                 EEOC Charge No. 460-2006-03106

Dear Ms. Edwards:

    This statement of position and attached documents are submitted on behalf of Louisiana Cardiology Associates ("LCA") in response to the Commission's request in the above-referenced charge. LCA submits these materials to assist the Commission in its investigation. This response is not to be construed as a waiver of any objections the company may have to the sufficiency or timeliness of the charge or to the Commission's jurisdiction, but is provided to the Commission in order that this matter may be resolved expeditiously subject to any and all objections LCA may have. LCA reserves the right to supplement this statement of position as additional facts relating to the charge become available.

    In his charge, John McMorris alleges that LCA eliminated his incentive pay and terminated his employment because of his age, 63. LCA denies this allegation and submits that the facts, as discussed below, demonstrate that McMorris' charge is insupportable and without merit.

### Background Information

    LCA is a physician practice group servicing the Greater Baton Rouge area and specializing in the field of cardiology. McMorris was initially hired to work at LCA on May 1, 2002. He was hired as a nuclear medicine tech by Karen Engelhardt (45), LCA's Executive Director. Significantly, he was 60 years of age when LCA first hired him.

Case 3:07-cv-00877-RET-SCR    Document 21-5    03/31/2009    Page 1 of 8

Pamela J. Edwards
July 20, 2006
Page 2

¶1 At all times throughout his employment, McMorris was an at-will employee and did not have an employment contract.[1] At the time of his hire, McMorris was advised of and provided with a copy of the company's Employee Handbook containing various personnel policies, including an Equal Employment Opportunity policy prohibiting age discrimination and a Work Place Harassment policy prohibiting harassment on the basis of age.[2] During his employment, McMorris also attended employee training on LCA's policies prohibiting employment discrimination and harassment.

At the time he was hired, McMorris was LCA's only full-time nuclear medicine tech. His initial compensation plan included a base salary plus a capped bonus incentive based on the overall productivity of the nuclear medicine department. As the only full-time nuclear medicine tech, McMorris was responsible for and oversaw the work performed by temporary techs that also worked in the department on occasion. Based on the additional responsibilities of overseeing the temporary techs, LCA believed McMorris' compensation plan was fair and provided a good incentive for him to increase productivity of the overall department.

¶3 As the volume of patients in the nuclear medicine department expanded, LCA decided to hire a second full-time tech, Susan Lanclos (32), in August 2002.[3] Lanclos resigned her employment for personal reasons in 2004. After Lanclos left, LCA hired Dale Radley (35) as the second full-time tech on January 17, 2005. Radley was paid an hourly wage plus time and a half for overtime. Radley did not receive a bonus incentive based on productivity.

¶4 McMorris was considered the chief tech with final authority for scheduling patients. He also was responsible for department quality and making sure both of LCA's labs remained open and were adequately staffed. McMorris did not supervise Radley or oversee his work product. Instead, both techs reported directly to Dexter Ray (41), LCA's Director of Imaging and Ancillary Services.

From the time Radley was hired until January 3, 2006, McMorris and Radley did not work in the same location. Instead, the techs worked separately at LCA's two offices in Baton Rouge. On January 3, LCA combined their Baton Rouge offices into one new location and the techs worked in the same lab in the new office.

A. **LCA Restructured McMorris' Incentive Plan Commensurate With His Responsibilities in the Nuclear Medicine Department.**

¶6 Soon after McMorris and Radley began sharing a lab in the new office, it became apparent that Radley knew that McMorris was being compensated for Radley's productivity.[4]

---

[1] Relevant portions of LCA's Employee Handbook are attached as Exhibit 1. LCA's Nature of Employment policy confirming at-will employment is attached as Exhibit 1, p. 1.
[2] See LCA's EEO policy, Exhibit 1, p. 1 and its Workplace Harassment policy, Exhibit 1, p. 2.
[3] Lanclos had previously worked for LCA as a treadmill tech and decided to go to nuclear technician school. LCA paid a stipend to Lanclos to assist in the costs of this training.
[4] LCA did not disclose McMorris' compensation plan and can only assume that McMorris shared this information with Radley.

BR.453501.1

Radley subsequently questioned Ray as to why McMorris was being compensated for work performed by Radley. Radley expressed his displeasure with this arrangement and questioned what incentive he had to work harder, when the primary beneficiary of his labor would be McMorris, even though McMorris took no part in Radley's work product.

The inequities in the compensation structure and LCA's desire for McMorris to take more responsibility for the nuclear medicine department prompted LCA to reevaluate McMorris' compensation plan. On February 20, 2006, Engelhardt and Ray met with McMorris to discuss McMorris' compensation plan as it pertained to his duties in the nuclear medicine department. Engelhardt and Ray explained their determination that the structure by which McMorris had been compensated was no longer reflective of his current responsibilities. A new compensation structure was discussed that would take into consideration his performance, quality goals and accountability. McMorris was not receptive to the change in compensation, and he told Engelhardt and Ray that he believed he had a perpetual employment contract which could not be modified and that he was entitled to be compensated based on the overall productivity of the entire department, including for work he did not perform. Engelhardt explained that no employee of LCA has ever had a perpetual employment contract and that McMorris, like all other LCA employees, was employed on an at-will basis. The meeting concluded with Engelhardt and Ray explaining that a new compensation structure would be presented to McMorris in the following few weeks.

Following this meeting, McMorris sent a mass email to all of the physicians at LCA requesting their involvement in the discussions regarding his compensation. Several of the physicians felt McMorris' actions in attempting to drag them into his personnel compensation issue were inappropriate. The physicians employed Engelhardt and Ray to handle these types of issues.

On March 7, Engelhardt and Ray met with McMorris to explain his new compensation structure. He was given a formula in a spreadsheet that would allow him to input historical data to determine how his income might be impacted based on the criteria selected. McMorris was informed that his base salary would remain the same and that he would still be eligible for a bonus incentive with the same capped value as before. However, the bonus incentive would not be based on Dale Radley's work volume. Instead, it would be based on McMorris' efforts in helping the lab become accredited and on reducing the amount of unused or wasted doses for the nuclear medicine department. LCA did not consider either of these tasks to be very difficult and fully expected McMorris to cap out under the new incentive plan, and, thus, continue earning the same amount that he previously made while relying on Radley's work volume.

McMorris' allegation that LCA "eliminated" his incentive pay plan is simply untrue. Rather, LCA revised the pay plan to make it more closely tailored to his responsibilities, and did so in a way that enabled McMorris to earn just as much as he had been. His misrepresentation that his incentive pay was eliminated casts serious doubt on his overall credibility.

More importantly, the change had nothing whatsoever to do with his age. There were two primary reasons for modifying the incentive plan. The first reason was to more accurately

reflect the current staffing and responsibilities in the department following the consolidation. When McMorris was originally hired, he was the only full-time tech. As an incentive to grow the department and because he was also responsible for the work product of the temporary techs, he received a bonus based on the overall production of the department. However, after Radley was hired, McMorris did not oversee Radley's work product. Radley was producing at a higher volume than McMorris, but McMorris was still being compensated and rewarded for Radley's work. Based on these factors, LCA determined that a more appropriate compensation structure was warranted.

The other significant reason was to help McMorris take "ownership" of his role as the chief tech in the nuclear medicine department. This included assuming responsibility for the department, resolving scheduling issues and ensuring that the lab was always available to doctors during normal operating hours.

LCA's intent was to establish goals that McMorris could achieve, and, thus, maintain his previous level of compensation.[5] The goals of overseeing the accreditation process, monitoring the amount of unused doses and taking responsibility for the department as the chief tech were not difficult goals. Most of these goals could have been accomplished during downtime between procedures in the lab. However, McMorris was not satisfied with his new incentive plan. He thought he was entitled to a perpetual contract. This dissatisfaction ultimately caused McMorris's attitude towards his job to further deteriorate and likely contributed to his failure to fully assume his responsibilities in the nuclear medicine department.[6]

### B. McMorris Was Terminated for Closing the Lab and Leaving Work Early Without Permission.

The nuclear techs scheduled patients for nuclear procedures on a daily basis. In a nuclear medicine procedure, a tech injects radioactive tracers into a patient's blood system. Scanners are then used to monitor and image the patient's heart and vessels. Only certified nuclear technicians are allowed to perform these procedures, which is why at least one of the certified techs (McMorris or Radley) was required to be in the office until the doctors finished seeing patients or until it was certain that no additional nuclear procedures would be needed each day. McMorris was the chief tech and it was his responsibility to ensure that the lab remained open and that a tech was present in the event a patient needed an unscheduled nuclear procedure.

Only one tech worked on Fridays, and McMorris and Radley rotated this assignment. A troubling pattern began to emerge in the nuclear medicine department on Fridays. The techs would schedule patients as early as possible and then close the lab early after completing the scheduled procedures. This practice of leaving early became a problem after doctors began

---

[5] McMorris' new compensation plan still placed him in line to earn significantly more than Radley because Radley did not receive an incentive bonus.
[6] Indeed, McMorris had previously been counseled about having a bad attitude by Karen Engelhardt during his 2004 performance appraisal. A copy of this performance appraisal is attached as Exhibit 2.

BR.453501.1

Case 3:07-cv-00877-RET-SCR   Document 21-5   03/31/2009   Page 4 of 8

calling the department needing to have unscheduled procedures performed, only to be told that the lab was closed and the tech had gone home early.



After receiving complaints from several of the doctors who were unable to schedule nuclear medicine procedures because the techs had closed the lab early, Ray met with McMorris and Radley in around January 2006. Ray emphasized the importance of having at least one tech remain on duty until all of the doctors finished seeing patients, or until each doctor's nurse informed the techs that there would be no additional nuclear procedures needed that day. Ray verbally counseled both techs that the pattern of leaving early and closing the department as soon as the scheduled patient studies were completed, without first confirming that no unscheduled procedures would be added to the schedule, would not be tolerated.

Ray subsequently reminded McMorris again during their meeting with Karen Engelhardt on March 7, 2006 (when McMorris' new incentive plan was presented) that the lab was to remain open until the nurses informed them that no additional nuclear procedures would be needed and that it was particularly important on Fridays because there was only one tech scheduled to work. Despite these warnings, McMorris disregarded Ray's direct instruction just three days later.



On Friday March 10, McMorris was the only tech scheduled to work the nuclear lab. On this day, there were 12 nuclear medicine patients on the schedule. Upon completing the scheduled procedures, McMorris closed the lab and left early without ensuring that no additional procedures would be needed. Subsequently, at approximately 1:00 p.m., one of LCA's physicians, Dr. Moonan, had a patient needing a nuclear medicine procedure. A nurse called Ray and told him that nobody was answering the phone in the nuclear lab. Ray went to the lab and found that it was closed and McMorris was gone. Ray was forced to tell the nurse that the lab was closed because McMorris had left early. Later that afternoon, there was an additional request for a nuclear procedure, with the same unsuccessful result. In both instances, the physician was forced to admit the patient into the hospital to have the nuclear procedure performed. This was significant because the hospital is one of LCA's major business competitors in the nuclear medicine field. LCA was forced to refer work that it could have performed to a business competitor. Several physicians complained about this directly to Ray and told Ray that action needed to be taken.

After these incidents, Ray met with Engelhardt and Engelhardt made the decision to terminate McMorris' employment. Since McMorris was scheduled for vacation beginning March 13, he was informed of the termination decision upon his return to the office on March 20. The termination decision had absolutely nothing to do with age. Instead, McMorris was terminated for closing the lab early and leaving work without permission, after repeated warnings not to leave until confirming that no nuclear procedures would be needed. McMorris' actions violated LCA's Employee Conduct and Work Rules Policy prohibiting employee absences without notice and insubordination.[7] Indeed, McMorris' actions were in direct disregard of the counseling Ray gave him earlier that same week.

---

[7] *See* LCA's Employee Conduct and Work Rules policy, Exhibit 1, p. 12.

BR.453501.1

McMorris' position was ultimately filled by Susan Lanclos. As discussed, Lanclos had previously worked for LCA as a full-time nuclear medicine tech and resigned her employment for personal reasons in 2004. Lanclos was actually hired back into a PRN position prior to McMorris' termination, and her official start date was March 20, 2006. After McMorris was terminated, Lanclos shifted into the full-time nuclear medicine tech role.

In his charge, McMorris claims that Radley and Lanclos left work early without being terminated. While both Radley and Lanclos may on occasion leave early with permission, McMorris was also permitted to leave early. However, all three employees were responsible for completing all nuclear medicine procedures and ensuring that no additional procedures would be needed <u>before</u> closing the lab. Radley and Lanclos have complied with this policy. McMorris did not and it resulted in his termination. If Radley or Lanclos were to close the lab and leave early and additional nuclear medicine procedures were subsequently needed, their employment would also be terminated for the same reason.

The facts in this matter do not support McMorris' claim that he was discharged because of his age. Not only is McMorris' age discrimination claim insupportable, it is also illogical. McMorris was hired by Karen Engelhardt, who is 45 years old. It makes no sense that Engelhardt would hire McMorris when he was 60 years old, and then terminate him just three and a half years later because of his age. As the Commission is aware, in such a case where the person making the hiring decision and the person taking the employment action are the same, an inference of <u>non-discrimination</u> exists. *See Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) ("... this situation gives rise to an inference of non-discrimination because it is unlikely that a decision maker 'would hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job.'"), citing *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir. 1996) (*quoting Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991)).

The evidence presented supports the fact that LCA terminated McMorris' employment for legitimate non-discriminatory reasons that had absolutely nothing to do with age.

## C. McMorris Made Joking Comments About His Own Age.

In his charge, McMorris claims that on one occasion Dexter Ray made a comment that "if he were as old as I, his feet would hurt too." Ray does not recall ever making this statement. However, LCA is aware that McMorris frequently made jokes about his own age, including, that he was getting old, and that various parts of his body ached because he was old, etc. Even if a comment was made to McMorris regarding his age, it would have only been made in jest and in response to McMorris' various age-related comments. Moreover, any such comment could only be considered a stray remark, which, as the Commission is aware, is insufficient to establish age discrimination. *See Waggoner v. City of Garland, Texas*, 987 F.2d 1160, 1166 (5th Cir. 1993) (explaining "as we have held on several occasions, a mere 'stray remark' is insufficient to establish age discrimination"); *Patel v. Midland Memorial Hospital and Medical Center*, 298 F.3d 333, 343-44 (5th Cir. 2002) (declining to find liability where statements were no more than

BR_453501.1

stray remarks). In fact, the comment cited in the charge allegedly made by Ray indicates that it was in response to a joking comment made by McMorris about his own feet hurting.

Moreover, Ray did not make the decision to terminate McMorris. Engelhardt did, as McMorris readily admits.

Significantly, during his employment McMorris never complained to anyone at LCA that he believed he was being discriminated against because of his age or that he was offended by any age-related comments. In fact, the first time McMorris' age was ever brought up was in a letter he wrote to Gayle Stelly, LCA's Director of Human Resources, after his termination, which vaguely stated that McMorris believed he was terminated because of his age.[8] Upon receiving this letter, LCA investigated this allegation and found no evidence to support McMorris' contention that he was discharged because of his age. LCA responded to McMorris and requested that he provide any information he believed supported his claims.[9] He declined to provide any such information.

### D. McMorris' Termination Had Absolutely Nothing to Do With LCA's 401(k) or Profit Sharing Plan.

McMorris also claims that LCA saved approximately $65,000 by terminating his employment because he was only eight months away from being fully vested in LCA's "401(k) profit sharing plan". His charge on this point is unclear as he fails to specify whether he contends that this alleged savings was a motivating factor or simply an unintended result of his termination. In either case, McMorris is wrong.

LCA offers eligible employees the opportunity to participate in a 401(k) plan and a separate profit sharing plan. The eligibility requirements are the same for both plans and require employees to have been employed for at least one full year and to have worked at least 1,000 hours during that year. Employees may begin participating in the plans upon reaching the first plan entry date following one full year of employment (January 1 or July 1).[10] Employer contributions to the plans are gradually vested. Employees become 100% vested after six consecutive years of employment.[11]

McMorris began his employment on May 1, 2002 and first entered the plan on July 1, 2003. The earliest he could have become 100% vested in the 401(k) plan or profit sharing plan would have been July 1, 2008. Therefore, contrary to his allegation in the charge, McMorris was still two years and four months away from becoming fully vested in either plan. At the time he was discharged, McMorris was 60% vested in the retirement plans. Through the end of 2005, LCA had contributed approximately $17,484 to McMorris' retirement. Of this amount, only 60% or $10,490 was vested and belonged to McMorris. The remainder of this money ($6,994)

---

[8] McMorris' letter to LCA is attached as Exhibit 3.
[9] LCA's letter to McMorris is attached as Exhibit 4.
[10] LCA's Summary Plan Description is attached as Exhibit 5; see pp. I-1 and I-2.
[11] See Exhibit 5, p. IV-1.

BR.453501.1

Case 3:07-cv-00877-RET-SCR    Document 21-5    03/31/2009    Page 7 of 8

was not vested and belonged to LCA.[12] Clearly, McMorris' participation in LCA's retirement plans had no impact whatsoever on the decision to terminate his employment.

### E. LCA Does Not Discriminate Based on Age.

LCA does not discriminate based on any protected category, including age. In fact, of the 132 people currently employed by LCA, 46 of them (approximately 35%) are 40 years of age or older. Thus far in 2006, LCA has terminated four people for violating company policies, and McMorris was the only person terminated who was 40 years of age or older. These facts clearly demonstrate that LCA does not discriminate against older employees.[13]

### Conclusion

LCA did not discriminate against McMorris because of his age. Instead, McMorris was terminated for leaving work early and without permission in direct disregard of the verbal warning given to him just three days earlier. Therefore, his actions also constituted insubordination for failing to follow the direct instruction of his immediate supervisor.

Based on the facts set forth herein, there is absolutely no evidence that LCA discriminated against McMorris based on his age. Accordingly, the charge should be dismissed.

\* \* \*

We believe this information is sufficient to enable the Commission to make its determination with respect to this charge. However, if you have any questions or need any additional information, please do not hesitate to call me at 225-376-0211.

Very truly yours,

PHELPS DUNBAR LLP

W. Bowen McRae, Jr.

---

[12] See McMorris' Retirement Performance Report, attached as Exhibit 6.
[13] See LCA's Turnover Analysis and EEO Job Group Analysis, attached as Exhibit 7.